## Blaylock v. Commonwealth.

(Decided June 19, 1931.)

J. B. SNYDER and H. H. FUSON for appellant.

J. W. CAMMACK, Attorney General, and GEORGE H. HITCHELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Affirming.

For the killing of Charley Hyden, the appellant, Paris Blaylock, has been convicted of manslaughter and sentenced to 10 years' imprisonment. Except for a trivial claim as to the admission of incompetent evidence in rebuttal, his sole ground for reversal of the judgment is that the verdict is not supported by the evidence.

We must look to the evidence of the defendant and his witnesses to learn of a preliminary difficulty, and to get the background of the immediate events.

The defendant testified he had known the deceased a short time by the name of "Charley" only, and that he had never had any dealings or conversation with him until about 6 or 6:30 on the evening of the day he was killed. At that time he was standing on a street corner in Wallins Creek, Harlan county, with several men, when Hyden, who was drunk, approached and asked if he wanted to buy a pint of whisky. Being told that he did not, Hyden said: "All right, by God," and walked on up the street. In a few minutes an unnamed, one-arm boy, also drunk, came along and began talking to and annoying him. He told this boy to go away and let him alone. Ten or fifteen minutes later Hyden returned and called Blaylock apart from his companions and accused him of "jumping on that one-arm boy," and at the same time, accordng to the defendant, he "jerked his pistol and jabbed me with it in the stomach." He denied having bothered the boy, whereupon Hyden cursed him. About that time Dan Gray, a constable, came along and took Hyden across the street. Several witnesses corroborate the defendant as to this transaction, including the drawing of the pistol by Hyden, but they do not substantiate his statement that the latter "jabbed him with it." Gray testified he heard the parties quarreling and when he saw Hyden, whom he believed to be drinking, attempt to draw his pistol, he grabbed him and made him stop, leading him down the street. He turned him

loose without taking the pistol from him. It may be observed here that if this officer of the law had not violated his plain duty this unfortunate tragedy would not have occurred.

George Hanks, the keeper of the bus station, and a restaurant in connection with it, was introduced by the commonwealth and testified that he met up with Hyden at a place described (which is apparently where he was left by the derelict police officer), and told him that he ought to go home to be with his sick baby. After a few words he opened the door of what is called a "transfer bus" and Hyden entered and was taken over to the bus station. He sat down at the counter and asked for a coca cola. As the witness was waiting on another customer his wife suggested that there was going to be some trouble. He looked around and saw Hyden and Blaylock, and started towards them when the shooting began. He could not say who fired the first shot. Hyden fell from the stool and his pistol lay on the floor at his right hand. He stated there was a bullet hole in the transom over a door which could not have been fired by Blaylock because of his position.

J. W. Blanton was, apparently, sitting between the two men. He heard Hyden, who was drinking, call Blaylock two or three times as he sat at the other end of the counter. He could not say whether Hyden had a weapon in his hand, because of an obstructed view, but he did see Blaylock approaching Hyden with a pistol in his hand held behind his back. Hyden asked what he had. The witness at that moment started to leave, and the shooting began before he got to the door. He says positively that Blaylock fired three times before Hyden shot his pistol.

Mrs. Hanks heard Hyden call Blaylock twice, "Paris, come here." At the second call he started to him with the pistol in his hand at his back. Roy Lee Hill gives the same evidence, with the addition that he heard Hyden ask "what was the matter with you and that one-armed boy," and Blaylock replied, "nothing," and then Hyden asked: "What have you got behind you," to which he replied "nothing"; and Hyden then said: "If you have got anything pull it." He said that two or three times, and then the shooting commenced. The witness did not know who fired first.

The defendant testified in his own behalf as to what occurred afted Hyden was taken away on the street. He stated that he with two men went over to a church tent

near the bus station, which was in the direction of his home, and got his wife and started home. She stopped at the station to get some sausage and they went in together and asked for some coca cola. As he started to drink from the bottle Hyden came in the door with a pistol in his hand. He was watching Hyden as he was looking straight towards him. We quote his continuing testimony:

"He went to the other end of the counter. He said 'Paris, come here.' I said: 'What you want?' He said: 'Come over here.' He jerked his pistol out and said 'God damn you, I said, "Come over here." ' When he jerked his pistol out I raised up, put my pistol behind me and walked over to where he was sitting. He says: 'What did you jump on that one-armed boy for?' I said: 'A thousand times I have told you I didn't jump on him, never touched him.' He said again, 'What did you jump on that one-armed boy for over here?' He had his pistol cocked, had hold of the handle. Then he said: 'What have got behind you?' I said 'I ain't got nothing.' He said: 'What you got behind you?' I said 'I ain't got nothing.' Then he said 'If you got anything pull it.' He raised his pistol up, I ducked and it fired, and I shot four shots. I was shooting black powder cartridges and it got smoky, after the first shot I could not see him".

The defendant added that he could not have gone out of the room when Hyden approached without having to turn his back on him, and this he was afraid to do because Hyden had his pistol out. The reason he did not step back from him was that he thought he "could talk him out of it."

A number of witnesses clearly and fully corroborate the defendant's testimony, including his statement that Hyden fired the first shot, and that he dodged before firing his pistol at Hyden. Others could not say who fired first. The preponderance of the evidence, both numerically and in substance, supports the defendant's claim of shooting in his necessary self-defense, and of a justifiable homicide. But there was the positive evidence of Blanton and the circumstances indicating that the defendant approached his adversary ready, able, and apparently willing for the dificulty. The facts are not unlike those appearing in Bourne v. Commonwealth, 234

Ky. 842, 29 S. W. (2d) 561, in which the evidence was held sufficient to support the judgment. The state of this record is likewise similar to that one as the witnesses talked a good deal with their hands, and the illustrations are not disclosed to us.

This court cannot sit as a jury nor usurp its functions, although our conclusions might have been different. Our rights and duties are defined and limited. We are constrained to hold that there was sufficient evidence to support the verdict, and that it is not palpably against the evidence.

Judgment affirmed.